## NATIONAL LABOR RELATIONS BOARD v. WASHINGTON DEHYDRATED FOOD CO.

### No. 9486.

Circuit Court of Appeals, Ninth Circuit.
April 9, 1941.

Laurence A. Knapp, Asst. Gen. Counsel, Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Allen Heald and Nanette Dembitz, Attys., and William R. Walsh, Regional Atty., National Labor Relations Board, all of Washington, D. C., for petitioner.

Clark & Grady, of Yakima, Wash., and Norman A. Eisner, of San Francisco, Cal., for respondent.

Before WILBUR, GARRECHT, and HANEY, Circuit Judges.

GARRECHT, Circuit Judge.

November 9, 1937, the United Cannery, Agricultural, Packing & Allied Workers of America, Local No. 1, of Yakima, Washington, filed with the National Labor Relations Board a charge that the Washington Dehydrated Food Co. of Yakima discharged J. D. Conner and Robert Howfield from its employ because they were members of said local. The "charge," filed under Section 10(b) of the National Labor Relations Act, 49 Stat. 449, 453, 29 U.S.C.A. § 160(b), asserted that the respondent in dispensing with the services of Conner and Howfield had, and was, engaged in unfair labor practices within the meaning of Section 8, subsections (1) and (3) of the said Act. 49 Stat. 452, 29 U.S.C.A. § 158.

Thereafter, on the 28th day of January, 1938, the Board issued its complaint against the Washington Dehydrated Food Co., alleging therein that the respondent discharged Conner and Howfield on October 25, 1937, because they joined and assisted the local designated above and engaged in concerted activities with other employees for the purpose of collective bargaining, etc. It was further alleged in said complaint that the respondent refused and refuses to re-employ either Conner or Howfield by reason of their affiliation with said labor organization; that the discharges amounted to discrimination against Conner and Howfield and had the effect of discouraging membership in said labor organization; that the said discharges coerced the respondent's employees so as to deprive them of the right to organize and bargain

collectively through representatives of their own choosing; that these factors have a close and substantial relation to interstate commerce; that the acts of respondent constitute unfair labor practices affecting commerce within the meaning of Section 8(1) and (3), supra, and Section 2(6) and (7) of the National Labor Relations Act. 49 Stat. 450, 29 U.S.C.A. § 152.

The answer of the respondent admitted the interstate character of its business, admitted the discharge of Conner and Howfield, and denied all the other allegations of the complaint going to the alleged unfair labor practices. It was affirmatively alleged that Conner was discharged because addiction to the excessive use of intoxicating liquor rendered him unable to perform his duties properly and that he burned and otherwise damaged fruit; and that "respondent did discharge him from its employ because of his conduct * * * and his becoming unfit and incompetent to perform his duties for which he was employed." In reference to Howfield, respondent alleged in its answer that he was employed for temporary work in cleaning about respondent's plant; that he negligently damaged a large quantity of box shook; that in so doing he demonstrated his unfitness and incompetency to perform the work for which he was employed.

A hearing was had February 23, 24, and 25, 1938, at Yakima, Washington, before a Trial Examiner designated by the National Labor Relations Board. Thereafter, findings of fact and conclusions of law were formulated by the Board, which entered an order, based thereon, against the respondent. This order directed that respondent cease and desist from (a) discouraging membership in, or discriminating against members of, the aforesaid labor union; (b) interfering with, coercing, etc., its employees in the exercise of the right to self-organization, etc. It was further ordered that respondent offer Conner and Howfield "immediate and full reinstatement, on resumption of the plant's operations, to the positions which they formerly held"; that Conner and Howfield be recompensed for loss suffered by reason of their discharge by back-pay, etc.; that respondent deduct from the sums otherwise due Conner and Howfield, monies received by each from relief agencies and pay over the amount so deducted to the appropriate agency which supplied the relief funds; and that respondent post notice of the cease-and-desist part of the order and also of the affirmative part thereof, with statement of compliance.

The cause is here on petition by the National Labor Relations Board for enforcement of its order.

Respondent's fruit dehydrating plant at Yakima is one of the largest of its kind and ships between 75 and 100 carloads of fruit a season; while occasionally other fruits, such as, cherries, prunes, apricots, or pears, are dehydrated, apples make up the bulk of the fruit which passes through the plant. The equipment for drying or dehydrating the fruit consists of twenty-one kilns arranged in four rows of five to each row and one large or "jumbo" kiln set apart from these four rows. The jumbo kiln is heated by two stoves or burners, and each of the other kilns is heated by one burner. The appearance of a kiln may be likened to that of two pyramids set base to base, the apex of the upper one to the top, which is extended several feet by a chimney-like ventilator; the lower part rests upon its apex, wherein is placed the burner or stove. This burner rests upon the fire-room floor; the flame from the burner is directed into a sheet iron cylinder about six by three feet, and the smoke and exhaust gases are carried on upward through the lower inverted pyramid or hopper, by means of a pipe or pipes, and on through the heating chamber and the kiln proper. The floor of the kiln, which is above the fire-room floor, and on a level with the loading alley between the rows of kilns, is constructed of wooden bars or slats, separated one from the other so as to permit circulation of air, upon which the fruit to be dehydrated is placed. Warm air passes through the space between the bars or slats, drying out approximately 80% of the water content of the fruit in from ten to twenty hours. All the kilns are located within the same building, although the large kiln is located in an alcove of the building, somewhat separated from the others. The loading alleys between the rows of kilns lead to weighing and sorting rooms, etc. The kilns are about twenty feet square, have a door leading to a loading alley, are lighted with a single 50 watt bulb, and have a water tap inside. The top and lower pyramid do not meet exactly base to base, so as to form a sharp angle, but a wall extends upward and downward of the loading corridor for, perhaps, three feet in each direction.

At a slightly lower level than the fire-room floor is another floor on which is lo-

cated the box-making room and storage space for box shook, the materials out of which boxes are made. Part of this room extends about four feet beneath the overhang of certain kilns. This room had a ceiling or roof of plain boards which was not waterproof. The stored box shook was tied in bundles of twenty-five pieces, and each bundle was placed one on top of the other, to a height of seven and one-half feet, at the back end of this room, in the part directly beneath the overhang of the hopper of the kiln or kilns directly above.

Fruit is prepared by being peeled, cored, and sliced or chopped; it is then placed upon the slat or barred floor of the kiln to a thickness of from five to eight inches. The fireman on the floor below brings the burner to the requisite degree of heat, places a sulphur pot in the furnace (to prevent discoloration of the fruit) and the drying process begins. Sometime later men enter the kiln, after the sulphur pot has been removed, and turn the fruit. The turning is repeated several times during the period necessary for proper dehydration, and thereafter the fruit is removed from the kiln for weighing, sorting, etc. After the dehydrated fruit is removed, the kiln is cleaned by moistening the walls and floor with a fine spray of water to dampen and soften any particles of fruit which may be adhering to the walls or floor, which then are swept or scrubbed with a metal brush, until clean. Thereafter the kiln is again loaded and the process repeated.

The Board, as heretofore set out, in its complaint charged that the two employees, J. D. Conner and Robert Howfield, had been discharged because of union activity and that respondent had interfered with, restrained, or coerced its employees so as to deprive them of any right to organize and bargain collectively. Respondent denied these charges and claimed that the discharges took place in the ordinary course of the operation of its plant, for good and sufficient reason, and that any union activity of said employees had nothing to do with it, and affirmatively alleged that Conner was employed as a fireman working nights, whose duty it was to keep fires of sufficient temperature to properly cure and dry fruits being processed by respondent, which work required care and strict attention to the same; that for some time prior to his discharge said Conner had become addicted to the excessive use of intoxicating liquor, and on many occasions during his service as fireman and while on duty as such, he became intoxicated, so as to be unable to properly perform his duties, resulting in fruit being improperly cared for and dried, and in some instances wholly destroyed and burned and otherwise damaged; that such conduct made it unsafe to have him perform his duty as fireman, and it became necessary for the respondent to, and said respondent did, discharge him from its employ because of his conduct and his becoming unfit and incompetent to perform the duties for which he was employed.

As to Howfield, respondent alleged that he had been employed for temporary work around the plant, that in doing such work he did it in such a negligent manner as to injure and damage a large quantity of box shook, which demonstrated his unfitness and incompetency to do or perform the work for which he was employed or any other work about the plant, and by reason thereof was discharged.

The Board by its findings determined that the discharge of these two employees was because of their union activity, and entered its order accordingly.

In opposing the issuance of the order of enforcement respondent insists that there is not sufficient competent evidence to sustain the findings of the Board, and further, that the trial examiner was so biased and unfair and his conduct so arbitrary and capricious that respondent was denied a fair and impartial hearing. Either of these contentions, if found to be correct, is sufficient to require a denial of the petition to enforce the order of the Board.

Because of the charge of unfairness made against the Trial Examiner and the claim that there is no substantial evidence to sustain the findings of the Board, we have carefully examined the entire record. It seemed to us wise to let this record speak for itself; accordingly, we have reproduced in this opinion, perhaps at too great length, copious extracts from the evidence given at the hearing.

As alleged, J. D. Conner was employed by respondent as night fireman. It was shown that he often drank, sometimes being so intoxicated while on duty as to render himself incapable of carrying on his work in a competent manner. Indeed, the Trial Examiner, in the process of the hearing, said:

"May I suggest, counsel, that we have a great deal of testimony about Conner's drinking. Apparently, there has been no ef-

'fort made to rebut the fact that Conner did drink. Now, are you apprehending such rebuttal testimony?

"Mr. Grady: * * * I realize, if the Examiner please, it is cumulative. At the same time I think it is an issue here and I anticipate there will be some rebuttal. I do not know.

"Trial Examiner Wood: The testimony is ruled out on the ground that it is unduly cumulative. As and when the rebuttal shows the necessity for further testimony, you may consider the matter again, counsel."

Mr. Jones, who acted sometimes as night superintendent and at times as kiln foreman, warned Mr. Conner. His testimony in this regard was:

"Q. (By Mr. Grady) Mr. Jones, did you ever talk to Mr. Conner about his drinking while on duty? A. Yes, I have several times.

"Q. And what did you tell him? A. I told him it was going to get him in trouble if he didn't quit it; I told him at least a dozen times.

"Trial Examiner Wood: What was your capacity at the time you warned him?

"The Witness: Mostly when I was superintendent, and I warned·him—he went off the job before we even started this last's season's run.

"Q. (By Mr. Grady) What, if·anything, did he say about it? A. Well, he promised that he was going to lay off it, leave it alone until the work was all over.

"Q. Do you recall any occasion when he left his work? A. I do, once.

"Q. About when was that? A. Well, I couldn't say the exact date, but I should say about ten days before we started the night crew.

"Q. Now, what year was that? A. That was in latter part of 1937.

"Q. Just tell about that occasion. A. Well, this one particular night he was drinking pretty heavy, and just about 11:30 I guess when Kilbourn and myself went upstairs to make a few turns, we rang the bell to have the sulphur moved off of one of the kilns and we couldn't get an answer. So we came downstairs and just as we came through the entrance one one side Mr. Conner came in the other entrance with a paper sack and made the remark when he came in that he intended to get back before we needed him.

"Q. Was there anything about his appearance that was out of the ordinary? A. I cant say he was really drunk at that time, but he was under the influence of liquor pretty strong.

"Q. Do you know what he had in the sack? A. I think he had about six cans of beer in the sack.

"Q. Do you recall the occasion when he ceased to be employed, the time? A. Yes, sir, I do.

"Q. How long was this before that? A. I don't know just exactly how long it was. This here happened about a week or ten days before we started the night crew.

"Q. Do you recall just about when you started the night crew? A. No, I don't. I don't recall just exactly what date that was.

"Trial Examiner Wood: Approximately, Mr. Jones? When was the night crew started?

"The Witness: I couldn't come anywhere near it.

"Trial Examiner Wood: Well, can you tell us the month?

"The Witness: Well, it was, I imagine, the fore part of October.

"Q. What can you tell the Examiner about his condition in connection with his work while he was drinking? A. Just one or two drinks didn't seem to make so much difference in him, but if he got too many drinks, why he seemed to forget about his work, neglect his work; and on a few occasions he would get so many drinks that he would lay down in a wheelbarrow behind one of the kilns and sleep for two or three hours sometimes and he would sleep it off.

"Q. What would have to be done on those occasions for someone to take his place? A. Well, the kiln foreman would have to look after the fires, or myself.

"Q. Do you know anything about the effect of his condition on the fires at any time? A. I don't just get that.

"Q. I say, do you know whether or not his being under the influence of liquor or drinking had any effect on his work with reference to keeping up the fires? If so, state that. A. Yes, it had quite a lot of effect.

"Q. In what way? A. Because the fires all looked just about the same to him whenever he was under the influence of liquor; he couldn't judge a good fire from a poor one.

"Q. Can you state whether or not any fires ever went out on him on these occasions? A. Yes, there have been. I knew of one occasion when we went in kiln No. 19 to turn it and it was just ice cold in there. We rang the bell and asked how 19 was and he said it was all right. He hadn't even looked at it yet.

"Q. About when was that? A. That was in the early part of this last season.

"Q. What sort of a worker was he when he was not drunk or drinking? A. He was a good fireman, one of the best.

"Q. Did you ever have any talk with him about his drinking, any of the trouble that it ever made for him? A. Just when I warned him."

Before the damage to the fruit occurred, superintendent Dasdice had heard something about Conner drinking while on duty. Mr. Jones, who was then working on the night shift with Conner, complained to Dasdice about Conner drinking too much and neglecting his work and putting additional burdens on others. This was a few days before the happening of the incident in question. Jones testified as follows:

"Q. On the job? A. Yes, on the job.

"Q. When was the first occasion, Mr. Jones, that you told Mr. Dasdice that Mr. Conner was drunk? A. That was the first part of this last season.

"Q. Do you remember about when that was; about what date? A. Oh, a couple of weeks after we had started.

"Q. Were you acting as night superintendent at that time? A. No, I was not.

\* \* \*

"Q. And what was the occasion, what was the reason for your telling Mr. Dasdice about it at that time? A. I told Mr. Dasdice that I hated to start in another season with Mr. Conner; he drank excessively on the job and it was too much trouble to look after him and the fires both.

\* \* \*

"Trial Examiner Wood: Well, were you making a complaint to Dasdice, if you call it a complaint.

"The Witness: I was just talking with him. I told him that I hated to start in another season with Conner drinking the way he was on the job. He promised not to do it and he had started in again now and I hated to start in with him again.

"Q. Mr. Jones, what was the reason you never reported to Mr. Dasdice the fact that Mr. Conner had been drinking prior to that time? A. Well, Mr. Conner was a good fireman, darned good fireman when he was not drinking. He was easy to get along with. I liked him. That is about the only reason I can give, that I didn't.

"Q. Didn't you consider it was your duty to report that? A. Yes, I knew it was my duty.

"Q. But nevertheless you did not report it? A. I did not report it.

"Q. Prior to October 25th of this season, last season, have you known of any occasions on which there has been any considerable quantity of scorched or burned fruit? A single instance of that, I mean. A. No, not any great quantities other than this one time."

On the evening of October 24, 1937, just before night fireman Conner went on duty, superintendent Dasdice had inspected the fruit in the kilns that was in process of being dried, and found the same progressing satisfactorily and the fruit in good order. Early the next morning, just after the night shift had gone off duty, Dasdice arrived at the plant and immediately examined the fruit and found that a large quantity of it had been so badly burned as to be a total loss.

Mr. Dasdice testified that there could occur no such burning if the fireman was attentive to his duties. He held that the fireman was solely responsible for the burning of the fruit. At once the rumors and complaints he had heard of Conner's addiction to drink came to mind, and on account of the extent of the damage he surmised that Mr. Conner must have been drunk. At this time Conner had already left the plant. The superintendent immediately declared that Conner was discharged and gave orders that he should not be put to work thereafter, and left a note to that effect, in case he did not get to tell Conner before he returned for his shift; and another night foreman was hired in his place.

During his tour of inspection of the plant that morning the superintendent also discovered that certain box shook stored in a room below the kilns had been stained and damaged because the swamper or cleaner of the kilns above, in disregard of instructions to use only a fine spray of water during the cleaning process, had made use of so much water that it ran down into the room below, causing the damage. The superintendent thereupon

discharged Robert Howfield, the night swamper.

Ira D. Cardiff, the founder, president, and general manager of the respondent, and Joseph A. Dasdice, for the past twelve years plant superintendent, testified that neither of them at the time of the discharges had any knowledge of any union activity or union affiliations of said employees.

Parenthetically, it should be noted here that although this testimony of the general manager and superintendent is uncontradicted, the Board entirely disregarded it, insisting that because of certain alleged inaccuracies or contradictions upon other matters these witnesses were entirely unworthy of belief. So-called contradictions will be examined and disposed of hereafter.

### The Trial Examiner

Since the findings of the Board are predicated upon those portions of the record which find support only in unrestrained, uncorroborated hearsay, characterized as "background," supplemented by unreliable volunteer statements of the Trial Examiner implemented as evidence together with answers of witnesses in reply to the Trial Examiner's hypothetical questions based on his own mathematical calculations for which there is no foundation in the evidence, we will first examine the charge of unfairness and bias lodged against him by respondent.

The record shows that there were two attorneys appearing for the Board, prosecuting the complaint herein, that they were alert, zealous, and careful to bring out all facts that tended to prove the charges against respondent. The Trial Examiner, however, assumed, and his manner unmistakably indicated that he considered, the efforts of the prosecutors so inadequate that he felt impelled to take up the prosecution himself. He further insisted that he have the last word with each witness and that counsel should not examine further when he had concluded. He made this plain early in the trial when he announced: "I would like to advise counsel that the Trial Examiner is exceedingly loathe to permit further examination after he has examined the witness, where such examination is necessary. I prefer to have counsel finish his examination of the witness. At such time, the Trial Examiner will then examine and the Trial Examiner will not allow, after his own examination, further examination by counsel, except

where the Trial Examiner has touched upon a new subject not broached on the examination by counsel themselves, which happens rarely. Please arrange, counsel, therefore, to complete your examination before the Trial Examiner undertakes to examine the witness, when such does occur."

As might well be anticipated, this unusual procedure created some embarrassing situations which counsel for respondent found difficulty in meeting. More of this later.

After this announcement and during the hearing, the Trial Examiner cross-examined practically every witness, the report of which comprises a large portion of the record. This part of the examination is designated throughout the record under the caption "Chair Examination," which from its character appears to be a particularly rigid method of putting the witness on the rack.

Many times, over the objection of respondent, the Trial Examiner permitted petitioner to present evidence which in any ordinary trial would be excluded as improper or immaterial or hearsay. In overruling objections thereto, the Examiner, while conceding the defects, explained that it was admitted merely for the purpose of establishing "background," and at one place naively suggested: "Sometimes the background will substantially reinforce the position taken by respondent in defending himself." Rarely, indeed, was anything developed favorable to respondent in such immaterial, hearsay evidence, and when, inadvertently, this did happen, it was promptly stricken from the record. This will be shown in considering another phase of the case.

We are well aware that the courts have held that in these peculiar hearings no error can be assigned because of the admission of improper, immaterial, or hearsay testimony; but when this sort of evidence is the only foundation for the findings and order of the Board, then it cannot be said that they are supported by such substantial evidence as the law requires. In this case this immaterial, hearsay, so-called "background" is referred to again and again in the opinion and briefs of the Board and the arguments for sustaining them. On the other hand, the Board ignores uncontroverted testimony given by witnesses for respondent upon the unsupported statement of the Board that these

witnesses, on other matters, contradicted themselves or each other, so as to render them unworthy of belief—a charge which, we shall show from the record, is not sustained by the citations to the evidence given in the opinion or the briefs of petitioners.

Throughout the record the Trial Examiner showed a woeful lack of judicial poise, and there are repeated incidents in the record which indicate that he was determined to make a case against respondent and other manifestations of a disposition on his part to intimidate the witnesses to further his purpose. In the course of our opinion we shall call attention to a number, but by no means all, of these incidents which exemplify this spirit.

Respondent's president had been called by the Board as a witness and appears to have made an honest effort to answer all questions on direct and cross-examination. Just before the Trial Examiner took him in hand for his usual exclusive and final "Chair Examination," he sought to put the witness in the proper frame of mind by admonishing him as follows: "Will you please pay strict attention to the questions? Now, I have been very patient with you as a witness. You have not kept your eye on the ball. We are wasting a great deal of time now, and from now on I shall be very strict about it." At the point of interruption of this witness the record shows that the witness was answering the questions on cross-examination apparently as best he could. But the witness seems to have incurred the ire of the Trial Examiner on previous cross-examination when the attorney for the Board asked:

"Q. And what sort of inventory or stock on hand of raw apples do you usually keep? A. Well, I—I think I will have to decline to answer that, my friend, unless you can show the materiality of it.

"Trial Examiner Wood: It is not your place to consider materiality.

"Mr. Grady: If I may—

"Trial Examiner Wood: Mr. Grady.

"Mr. Grady: I think, Mr. Examiner, inasmuch as we have admitted that this business is engaged in interstate commerce and there is no jurisdictional question involved, that inquiry into our business management or internal affairs or financial affairs is wholly beside the question, and I must submit this is wholly immaterial to the issues, and I think we should not be asked to go into this matter."

There then occurred extended discussion, after which the Trial Examiner said:

"May I then take time, gentlemen, to read the complaint?

"I shall not insist upon your client, Mr. Grady, answering the question. I make that ruling without prejudice to a renewal by the propounding of another question, identical in character, at some other time, Mr. Walker.

"For the witness, I shall instruct you specifically, you are not here to evaluate questions propounded. That is the duty of your counsel. Proceed."

▆ Mr. Cardiff was president and manager of respondent, and we think it was not improper for him to have declined to answer an inquiry into the corporation's affairs that was immaterial and which might be used to its detriment.

The Trial Examiner also, at times indicated his willingness to inject expert testimony by himself. As exemplifying this disposition we select one of these incidents occurring during the testimony of respondent's superintendent, Dasdice. In explaining the necessity of the fireman attending to business at all times and how some of the fruit might become damaged by smoke, the following occurred:

"A. Well, sir, when the fire is too low there is not sufficient oil going in the furnace to make a flame, which will, by not being sufficient oil, it will go out at times and then she will catch and she will puff back. That causes the fruit to smoke.

"Trial Examiner Wood: Now, aren't you describing lighting off one of these stoves?

"The Witness: No, when they are in operation.

"Trial Examiner Wood: What kind of a stove is it?

"The Witness: It is a steel stove.

"Trial Examiner Wood: The oil is injected by means of a nozzle and atomized?

"The Witness: Yes, sir.

"Trial Examiner Wood: You light it off with a—

"The Witness: (Interrupting) With a torch.

"Trial Examiner Wood: With a torch?

"The Witness: Yes, sir.

"Trial Examiner Wood: And after you light it off, state whether or not it is exceedingly rare that you have to look at it again?

"The Witness: It is very essential that when you light a kiln that is cold, it should be watched for a considerable time until the furnace gets to the proper temperature.

"Trial Examiner Wood: So that your fire box is at the proper temperature?

"The Witness: Yes, sir.

"Trial Examiner Wood: But this question of smoke because of the fire being too low is merely a question of heating up your box properly when you light off your nozzle? Isn't that correct?

"The Witness: Yes, sir.

"Trial Examiner Wood: And that is the only time. Proceed Counsel.

"Q. (By Mr. Grady): Now, as I understand it, Mr. Dasdice, if the fire is allowed to go down it may go out? A. It will go out.

"Trial Examiner Wood: Now, counsel, I am very sorry, but I am having a little difficulty here, having been unfortunate enough to have had some engineering training in my time, and I just simply cannot visualize what you are implying in your questions.

"Mr. Grady: Well, I can explain it to the Examiner.

"Trial Examiner Wood: I prefer to have it explained through the witness, counsel.

"Mr. Grady: That is what I was trying to do, Mr. Examiner.

"Trial Examiner Wood: The matter of an oil box, where the oil is atomized through a nozzle, is all done by valves. The valve is set and if the temperature of the box is at a proper temperature, then the setting of the valve is sufficient and requires practically no more attention. When you light it off, then if there is not the proper heat temperature you would require adjustment of the valve. Am I right?

"Mr. Grady: No, not wholly so. I think if the Examiner could see this particular kind of a burner he would find that it differs quite a little from the burners that are found in books and in engineering journals and things of that kind, books which your Honor doubtless has studied. This is not 100% perfection, perhaps, from a mechanical standpoint."

To avoid repetition, and in the interest of time and space, other instances of this proclivity of the Trial Examiner to testify are not given here but will appear elsewhere in this opinion in the discussion of other points.

These interruptions served but to harass and confuse the witness. The following excerpt illustrates their futility:

"Q. Do you remember one time in a conversation with Mr. Cook, stating that Mr. Conner was discharged for too much smoked fruit? A. No, he was discharged for burning the fruit.

"Q. No, but did you ever make that statement to Mr. Cook? A. No.

"Q. Did you ever tell Mr. Cook that you did not know that anyone drank at the plant? A. I didn't catch that.

"Q. Did you ever tell Mr. Cook that you did not know of anyone doing any drinking at the plant? A. I didn't know it personally, no.

"Q. Well, do you know?

"Trial Examiner Wood: The answer is not responsive. Read the question.

"The Witness: Yes, I did.

"Q. (By Mr. Walker) And when was it you told him that?

"Trial Examiner Wood: Counsel, when I interrupt, I interrupt for a purpose. I want this record straight. I don't want a record made with unresponsive answers. Go back, Mr. Kane, please, to the point where I interrupted.

"(Thereupon the reporter read aloud the question referred to as above recorded, as follows:

"'Q. Did you ever tell Mr. Cook that you did not know of anyone doing any drinking at the plant?')

"Q. The Witness: Yes, sir."

It will be observed that as a result of this disconcerting interruption the witness changed his answer from "Yes, I did" to "Yes, sir."

Again, in the examination of this same witness, the Trial Examiner interrupted while the witness was giving the following testimony:

"Q. When did you first warn Mr. Conner about drinking? A. I did not warn him about drinking.

"Q. You never did? A. No, I didn't want him to know I knew that he drank.

"Q. You wanted to catch him first? A. I wanted to catch him, yes.

"Q. When did Jones ever warn Conner, if he did? A. You will have to ask Mr. Jones.

"Q. You never reported it?

"Trial Examiner Wood: Do you know whether Jones ever warned Conner?

"The Witness: He said he did, yes, sir.

"Trial Examiner Wood: Pardon?

"The Witness: He said he did, yes, sir.

"Trial Examiner Wood: When did he report that to you?

"The Witness: Oh, at various times.

"Trial Examiner Wood: When did he report that to you?

"The Witness: Oh, at various times.

"Trial Examiner Wood: When did Jones first report having warned Conner about drinking on duty?

"The Witness: Some time this fall before he was discharged. I couldn't say the date."

The respondent, in answer to the charge that these employees had been discharged because of membership in, and affiliation with, a labor union, asserted that the manager and superintendent did not know at the time that these employees had any labor union affiliations. Superintendent Dasdice, who actually ordered their discharge, so testified, and, further, that he did not learn of their connection with a labor union until after the discharge. After he had been examined at length by the prosecutor for the Board and counsel for the defense, he was taken over by the Trial Examiner for his "Chair Examination," in the course of which he apparently misunderstood one of the Examiner's questions and made a reply which could be taken to admit that he did know that these employees had become affiliated with the union before they were discharged, which was not in harmony with his testimony theretofore on direct and cross-examination. Counsel for respondent, aware of this evident mistake, at the conclusion of the "Chair Examination" sought to interrogate the witness so as to make the matter clear. Thereupon the following occurred:

"Trial Examiner Wood: As to that, counsel, I don't wish to take time.

"Mr. Grady: Very well.

"Trial Examiner Wood: I have explained the reason for that before. I expect counsel, except when the Trial Examiner goes into a new subject matter, to complete their examination.

"Mr. Grady: This was not on that subject, if the Examiner please. It was a question I think, your Honor, the witness misunderstood one of your questions about the union men, when they were employed. I think there was a confusion in the witness' mind.

"Trial Examiner Wood: Step out of the room, please.

"(The witness leaves the chair and leaves the room.)

"Trial Examiner Wood: You refer to what question?

"Mr. Grady: I may have misunderstood, Mr. Examiner, but I have brought in my questioning the fact that union men have been employed for several years, and in answer to a question from the Examiner I understood that he first found out that there were union men after the 25th. When the Examiner—the Board's examiner, investigator, whatever you call him came,—now, that may be owing to my confusion and not to the confusion of the witness.

"Trial Examiner Wood: I will tell you what the witness stated.

"Mr. Grady: What was that?

"Trial Examiner Wood: That is certainly what the witness stated.

"Mr. Grady: But that is not consistent with what he had previously testified to.

"Trial Examiner Wood: That is true, also.

"Mr. Grady: That is why I think this witness may have misunderstood, because the Examiner will have observed he is not an educated man; he speaks with a foreign accent and he can easily misunderstand; and I wish to clear that up and see which is correct.

[Note: The record shows that this witness was sometimes confused in his answers, often because unfamiliar with words used by his questioners. To mention a few instances in point, he did not know what the word "discipline" meant; he had to have the meaning of the word "propensity" explained.]

"Trial Examiner Wood: Let the record show that the witness does speak with a broken accent, but the witness apparently has been here for many years and there is no good reason to believe, in the Trial Examiner's opinion, that the witness misunderstood any questions, with one or two exceptions which were immediately cor-

rected, and the reporter was instructed to re-read the question to the witness to obviate any such possibility.

"I shall ask the witness again. I shall call him again to satisfy counsel. Call the witness, please.

"Mr. Grady: Thank you.

"(Whereupon, the witness Dasdice returned to the court room.)

"Q. (By Trial Examiner Wood) Have you spoken with anybody since you left the chair? A. No.

"Q. No one at all? A. Just this gentleman there.

"Q. Which one? A. The reporter over there.

"Q. What is your name? A. Voice in the Audience: Lee Croson.

"Q. And what is your connection?

"The Voice: I am with the Yakima Morning Herald.

"Trial Examiner Wood: Thank you.

"Q. (By Trial Examiner Wood) You have told us two things, Dasdice. You told us that you knew there were union men in the plant and there had been for several years. A. Yes, sir.

"Q. And also that you found out that there were union men in the plant for the first time when the investigator for the National Labor Relations Board came. A. I misunderstood that. I meant to say the first time I knew we fired union men was when the investigator came from Washington, D. C. We did not know these two men were union men.

"Q. Did you discuss this with the person you just indicated? A. No; there was nothing said.

"Trial Examiner Wood: That is all."

Another example of this disposition to warp the evidence, which illustrated the unfair attitude of the Trial Examiner and his effort to require the witnesses, if possible, to conform to some preconceived notion of his own, was concerned with ascertaining the amount of fruit that was burned during the night of October 24th, when Conner was on duty as fireman. Dasdice, the superintendent, in the course of his testimony gave in evidence:

"Q. Did you check that record in the course of your investigation? A. Yes, I looked at the record.

"Q. And how many kilns were burning that night? A. Seven.

"Q. Seven kilns? A. Yes.

"Q. How many were burning during the day shift, when you were on duty? A. I beg your pardon. You meant burnt, the fruit burnt, or burning?

"Q. No, burning. A. Well, 18 or 19."

From this excerpt there could be no question but that the witness intended to give the information that fruit was burned in only seven of the kilns. But to make assurance doubly sure, Mr. Walker, the attorney for the Board, on cross-examination said:

"At this time the Board offers in evidence what has been marked Board's Exhibit 9 for identification. * * * To show when these seven kilns that burned were loaded and when they were taken off and the remarks with respect to each."

When Mr. Cardiff, the manager and president of respondent, was on the stand, this question of burned fruit was gone into.

"Q. Was your attention called to a situation which arose on the 25th with reference to any fruit? A. Well, this fruit which was burned, that I mentioned.

"Q. I wish you would tell the Examiner about that. A. Well, there was a large quantity of fruit that morning which was badly burned—a quantity—oh, it looked as though it was about 25% of this burned material in that fruit, burned until it was unusable, unsuited for food or for sale. Someone told me at that time,—I can't now recall who it was,—that there were seven kilns burned that night before; and later, in talking with the superintendent, the explanation was given that I first testified in regard to this man, Mr. Conner, being intoxicated and burning this fruit the night before. That was the explanation that was given to me.

"Q. By the way, had you ever had any trouble with any serious burning of fruit prior to that time? A. No, not of any consequence. Every day there may be a pound or two or three, something like that, get slightly scorched.

"Trial Examiner Wood: About how many pounds a season do you burn?

"The Witness: Oh, aside from this that I mentioned, it is almost a negligible quantity; doesn't amount to much; and usually just a slight scorching.

* * *

"Trial Examiner Wood: * * * You discovered the burned fruit yourself on the morning of October 25th? Is that correct?

"The Witness: That is correct.

"Trial Examiner Wood: And in what kiln was that?

"The Witness: This fruit, when I discovered it, it was then off the kiln and in the curing room, in the grading room, sorting room. It had already been taken off the kiln and as I stated before I was told that there were seven kilns which burned.

* * *

"Trial Examiner Wood: On the morning of October 25th you estimated about 25% of that which was being graded, having come off the kilns the night before, had been burned? Is that correct?

"The Witness: Well, I stated it looked like that. We later sorted it, and we have the exact figures, from the weigh-out.

* * *

"Q. (By Mr. Grady) How much did that amount to? A. Something over a ton —something over 2000 pounds. I have it in my brief case, if you care for the exact amount; I can give it.

"Q. Well, substantially. A. It was between 2000 and 2200 pounds. There were three lots of it that we sorted."

This testimony clearly discloses that this witness was testifying concerning seven kilns. The weight sheets of the burned fruit were offered in evidence, and found to total 2,063 pounds.

Later, still another witness, Wayne Rauscher, also testified concerning the burned fruit on his direct examination, as follows:

"A. Well, I never did anything with it until after it was sorted. Then I pick up the culls and the screenings and weigh them.

"Q. And how did you discover the scorched or burned fruit? A. Well, how I discovered it in the first place, I saw Mr. Dasdice looking at it up there and I was talking with him. That is how I first discovered it.

"Q. Did you take part in the sorting of it? A. No, I didn't do the sorting myself.

"Q. Did it go over the sorting table? A. Yes.

"Q. What was done with it after it was sorted? A. After it left the sorters a good part went down on the shaker, down in the curing room below, and the culls were left in bags and I took them out and weighed them up.

"Q. Do they go into the culls? A. All scorched stuff.

"Q. Did you attend to the weighing? A. Yes, sir.

"Q. Did you make a record of that weighing? A. Yes, sir.

"Q. What did you do with the record? A. Turned it in to Mr. Dasdice.

On cross-examination his evidence was as follows:

"Q. (By Mr. Babcock) Mr. Rauscher, how is it that you happened to observe that burned or scorched fruit during the month of October? A. Well, I did all the weighing of it and being in there that morning and seeing Mr. Dasdice with it, that is how I saw it in the first place.

"Q. You have nothing to do with the burned fruit before it is weighed? A. No, I have not.

"Q. You did see this, though, before it was weighed? Is that correct? A. Yes, I did. That is correct.

"Q. Did Mr. Dasdice ask you to come over and look at it? A. No, he did not.

* * *

"Q. (By Mr. Babcock, continuing) Do you know, Mr. Rauscher, what is done with the scorched fruit, that is whether it is sold or disposed of in any way? A. It goes into the 'bug bait', so we call it, just the scraps and the stuff they sack up in sacks. It is not fit for anything I ever knew of."

Then the Trial Examiner took him over for "Chair Examination"; and it is clear that he sought to have it appear that the estimate of twenty-five per cent was as to all nineteen kilns, when it is perfectly apparent that only seven kilns were burned.

"Q. Did you hear Cardiff's estimate that there was about 25% loss? Is that correct, counsel?

"Mr. Grady: Something like that. We have the record here.

"Q. (Trial Examiner Wood, continuing) Did you hear that? A. Yes, sir.

"Q. Are you able to tell us whether that is approximately right or not? A. I believe that would be approximately correct.

"Q. Now that particular morning do you know approximately how many tons of fruit had been unloaded? A. That isn't

really any of my business as far as anything like that.

"Q. I hand you Board's Exhibit 9 and ask you whether or not approximately 13 tons were unloaded that morning. A. According to this, I would judge there was somewhere in that neighborhood.

"Q. And 25% of 13 tons would be a little over three tons, would it not? A. I should think so.

"Q. And taking a short ton measurement, that would be about 6000 pounds, would it not?

"Q. And that would approximately mean that in the normal course of duties you would have had one hundred bags instead of four or five bags, would it not? A. According to that, yes, sir, although I do know that the weight of whatever I turned in that day wasn't that large."

The testimony of Alfred Dahl on this subject was as follows:

"Q. Do you recall whether you observed any scorched fruit that night? A. Yes, I remember one kiln.

"Q. Do you remember what kiln it was? A. No. 4.

"Q. How much scorched fruit was there in No. 4 that night? A. Well, that I don't know exactly.

"Q. Can you make an estimate of that? A. I imagine about 15% of it."

And on cross-examination:

"Q. Did you see the burned fruit and scorched stuff the next morning? A. I saw it in No. 4.

"Q. Did you see it anywhere else? A. No.

"Q. Did you look for it? A. Yes.

"Q. Did you see the scorched material after it got out of the kilns and into the pile? A. Just when we took it out, that is all.

"Q. Did you observe the sorting of it? A. No.

"Q. How much does a kiln hold? A. Oh, they run from 750 to 1000 pounds dried.

"Q. But you did not have occasion to see how much was scorched or burned the next morning when it was put out on the pile for sorting? A. I saw the pile but I didn't see it when it was sorted.

"Q. You did not see it when it was sorted? A. No.

"Q. And you were not there during the sorting process? A. No.

"Q. So you have no way of knowing how much was scorched or burned? A. Not exactly, no."

Thereafter he was taken in hand by the Trial Examiner for his "Chair Examination."

Respondent never contended that the burned fruit which was rendered unusable exceeded more than 2,063 pounds. Rauscher, whose duty it was to weigh the culls, turned in the figures which were offered in evidence, which amounted to 2,063 pounds. Dahl was testifying about kiln No. 4 only. His estimate that the burned fruit in this one kiln weighed about 150 pounds was on the assumption that the kiln contained not more than 1,000 pounds of fruit. The exhibit in evidence, however, shows that this kiln contained 1,160 pounds, which would make his estimate as to this one kiln too low. Dahl did not see the fruit after it had been taken from the kilns, or when it was being sorted, or after it had been segregated and weighed.

The patent effort of the Trial Examiner to distort this witness's testimony into an exaggerated contradiction of respondent's claim appears in this excerpt from the "Chair Examination" (questions by Examiner):

"Q. What is your opinion, based upon your experience and your employment as a kiln foreman, in reference to the scorched fruit that night being eleven times what you have estimated it was? A. I don't know.

"Q. Is your opinion based upon your experience as a kiln foreman, on that proposition? A. What is that?

"Q. In your experience, based upon your experience as a kiln foreman, is it possible that you could have under-estimated the amount of scorched fruit eleven times,—there is eleven times more than you estimated? A. That I don't know because I never had anything to do with the sorting and I don't know exactly how much they did take out.

"Q. Would it surprise you to learn that it was eleven times what you had estimated? A. Yes, it would."

There is no doubt that witnesses Cardiff and Dasdice both referred to seven kilns only as containing the burned fruit, which they testified amounted to 2,063 pounds, all of which is borne out by Board's Exhibit

No. 9. Nevertheless, the Board, particularly to discredit Cardiff and Dasdice in order later to justify the absolute disregard of their uncontradicted testimony, sums up the foregoing evidence as follows: "* * Cardiff variously estimated the damage as 25 per cent of all the apples—which would amount to approximately 5,000 pounds—, and 2,063 pounds running through seven kilns. Dasdice testified that seven kilns, or 2,063 pounds, were burned. Wayne Rauscher, whose duty it was to sort out the damaged apples, stated that 'quite a bit' had been spoiled; this he estimated as about 6,000 pounds. Dahl, the night kiln foreman, a witness called by the Board, testified that not more than 15 per cent of the apples in one kiln—about 150 pounds— were burned."

To better analyze this finding we segregate it as given by the separate witnesses, thus making it more susceptible of comment. The Board said: "Cardiff variously estimated the damage as 25 per cent of all the apples—which would amount to approximately 5,000 pounds." Nowhere in the evidence did he make any estimate of *all* the apples; nowhere did he suggest that the amount of damaged fruit amounted to 5,000 pounds. There can be no mistake, from the above evidence set forth, that he was testifying concerning burned fruit not in all the kilns, but only in seven kilns, which, according to the figures introduced in evidence as taken by the man who weighed the burned fruit, amounted not to 5,000 pounds, but to 2,063 pounds.

Further, the Board said that when "Dasdice testified that seven kilns, or 2,063 pounds, were burned," he was not in agreement with the other witnesses, but we submit that it corresponds with the testimony of Cardiff and Rauscher, and is not contradicted by Dahl. Again, the Board said: "Wayne Rauscher, whose duty it was to sort out the damaged apples, stated that 'quite a bit' had been spoiled." As will be seen from a reading of Rauscher's testimony, he said it was not his duty to sort the damaged apples, but only to weigh and carry them away after they were sorted. Further, the Board said, referring to Rauscher's testimony: "This [meaning the damaged apples] he estimated as about 6,000 pounds." Looking again to Rauscher's testimony, it very clearly appears that the Trial Examiner endeavored to have Rauscher make this statement on assumed figures that the Examiner supplied from his imagination. But Rauscher's reply was: "According to that, yes, sir, although I do know that the weight of whatever I turned in that day wasn't that large." The weight he turned in, as shown by the record, was 2,063 pounds.

Further, the Board said that "Dahl, the night kiln foreman, a witness called by the Board, testified that not more than 15 per cent of the apples in one kiln—about 150 pounds—were burned." This witness's testimony shows that this estimate was referring to scorched material that he saw in one kiln, No. 4; not in seven kilns. It will also be observed that the Trial Examiner in his "Chair Examination" unsuccessfully sought to commit this witness definitely to a proposition that but 150 pounds had been scorched and that this was in contradiction of the claim that 2,063 pounds had been burned, by pointing out that his estimate was about eleven times less than the actual weight presented. For the purpose of having Dahl contradict the other witnesses the Examiner queried:

"Q. In your experience, based upon your experience as a kiln foreman, is it possible that you could have under-estimated the amount of scorched fruit eleven times,— there is eleven times more than you estimated? A. That I don't know because I never had anything to do with the sorting and I don't know exactly how much they did take out."

The misleading effect of the Trial Examiner's conduct upon the Board is shown in the instances above stated, showing that the Board was misled into erroneous findings by adopting as facts answers to assumed, hypothetical questions that had no foundation in the evidence and which appeared nowhere in the record except in these erratic and misleading "Chair Examinations," and which findings are at variance with the actual admitted facts.

Another striking instance which impressively reveals the extent of the pernicious influence which the methods employed by the Trial Examiner exercised upon the findings and decisions of the Board, involves one of the very fundamental issues presented in this case.

As heretofore pointed out, there was so much evidence of Conner's drinking habits that the Trial Examiner stopped further inquiry into the subject. From this it could easily be assumed that the dangers to respondent's business from this habitual intoxication of Conner would be considered

as a matter of course; but such an ordinary, common-sense conclusion altogether underestimates the purpose and resourcefulness of the Trial Examiner.

The testimony of superintendent Dasdice on direct and cross-examination shows that he had been told of Conner's drinking and was almost convinced that it was his duty to discharge him, but he was reluctant to do so because he himself had not seen Conner taking a drink, and he did not want to do him an injustice. The evidence also reveals that, as one of his co-workers put it, "Mr. Conner was a good fireman, darn good fireman, when he was not drinking. He was easy to get along with." The superintendent also had a kindly feeling for Conner and did not want to discharge him until he himself caught him drinking. However, when Dasdice was confronted with the extensive damage done to the drying fruit through burning, which he knew could occur only through the negligence of the fireman, he determined in his own mind that Conner was drunk at the time, and as he expressed it, he felt it was either his job or Conner's job. Quite evidently, two considerations, the burning of the fruit and Conner's drinking, combined to bring about this discharge. The Trial Examiner, realizing the irresistible conclusion that such a combination of motives compelled, and that the evidence of Conner's drinking was too great to overcome, thereupon by his skillful "Chair Examination" sought to eliminate and exclude any consideration of the drinking habits of Conner. After the "Chair Examination" of Dasdice had proceeded for some time, he was asked:

"Q. It was the damage rather than the drinking? A. The damage rather than the drinking, yes, sir.

"Q. It was the damage— A. The damage, yes, sir.

"Q. I didn't finish my question. It was the damage rather than the drinking that resulted in Conner's discharge, was it? A. The damage?

"Q. And not the drinking. A. Never caught him drunk.

"Q. The reason for Conner's being fired was for spoiling the fruit? A. Yes, sir, correct.

"Q. And that was the only reason? A. That is the only reason, correct.

"Q. The drinking had nothing to do with it? A. No, sir.

"Q. And the fact that Conner burned that fruit was due to something you just estimated or calculated or assumed? Is that correct? I don't recall what word you used now. That was an assumption made by you? A. Yes, sir, it was.

"Q. State the basis for the application of that assumption, rather than coming to the assumption that it had happened on another shift. A. Well, sir, as I recollect, later Mr. Jones said several times he had to take charge of the kilns himself in order to get the fruit from being burned, when Mr. Conner was not able to fire.

"Q. When was that conversation with Jones? A. Previous to this burning. We had several conversations about that and Mr. Jones at the time was not available to help him out with the firing because he was working days; so I surmised that he must have been drunk when he burned it."

When the examination of the witness, Dasdice, had been concluded and another witness had taken the stand, the Trial Examiner then announced that he would hear no more about Conner's drinking for the reason, as he stated, "The superintendent has told us that drinking had nothing to do with the discharge."

This unfair method of compelling this simple, uninformed foreigner, through persistent questioning, to indicate some differential selection between a combination of motives fails to reveal any abandonment of the fact that the witness in discharging Conner had acted under the impression that he was drunk on the night the fruit was burned. The final statement of Dasdice in this connection proves that he still clung to this assumption. After all this rigorous questioning of the Trial Examiner, we note that in the last sentence in his testimony above quoted he repeated: "So I surmised that he must have been drunk when he burned it."

The effort of the Trial Examiner, through the method above described, to compel this witness to balance motives and make some election, does not alter his consistent testimony that both factors were present in his mind and combined to bring about Conner's discharge.

At the time that the Trial Examiner announced that he had decided that Conner's drinking had nothing to do with the discharge, witness Jones was on the stand. He had testified that he had held several positions in respondent's plant—kiln foreman on the day shift, night superintendent,

and had worked in the kiln some—and that he had known Conner for three years. He was then asked:

"Q. Can you tell anything to the Examiner about what you have observed about him, relative to any drinking habits? A. Well, he drinks quite a lot.

"Trial Examiner Wood: Counsel, I don't care to hear any more about Conner's drinking. The superintendent has told us that drinking had nothing to do with the discharge.

"Mr. Grady: Well, if the Examiner please, if I may be heard, I think despite the witness' opinion on the matter as to what motivated him, nevertheless that is admissible for the purpose of throwing light on this transaction and furnishing a justification. Of course I realize, or at least it is my viewpoint if the Examiner please, that it is not incumbent upon us to show any particular cause, so long as it does not appear that it was because of the charge alleged in the complaint, viz., unionism.

"And for the purpose of rebutting any inference that might be directed in that way we have a right to show that there was a cause that might be sufficient.

"Trial Examiner Wood: Counsel, the fact remains that the only person who directed this discharge was the witness Dasdice, who has told us, and we must accept what he has told us, that drinking had nothing whatever to do with the discharge of Conner. Now, then, it is more than the question of this witness' opinion. He knows.

"Mr. Grady: But I think a case of this kind cannot rest wholly upon the opinion of the witnesses. * * *

"* * * And there is a problem question involved here. It is well suggested, that of reinstatement, and the reasons therefor, and certainly that would be important,—have an important bearing on whether an employer could reinstate a man, assuming for the sake of the argument that he might have been improperly discharged.

"Still, if there is a justification for not taking him back that is ample.

"Trial Examiner Wood: Your first ground, in the opinion of the Trial Examiner, is not sound. Your second ground is sound. The testimony is relevant as regards reinstatement. Proceed.

"Mr. Grady: And if I may make the record, if the Examiner please, I offer all of this evidence on both issues."

In this connection we cannot ignore the fact that Mr. Cardiff was the president and manager of respondent. While the evidence shows that superintendent Dasdice had the authority to hire and discharge employees, it also shows that he was subordinate to Cardiff and, furthermore, that at the time when Dasdice was examining the burned fruit before Conner's discharge, Cardiff came into the plant, and Dasdice then and there told the manager that he surmised that the fireman had been drunk and caused the burning of the fruit, and that he had made up his mind to discharge him. This was agreeable to Mr. Cardiff, and thereafter the superintendent wrote the notice of discharge. The evidence shows that manager Cardiff never in any manner conceded that drinking had had nothing whatever to do with the discharge of Conner, but emphatically insisted upon it as this excerpt from his testimony distinctly reveals:

"Q. Well, now, Mr. Cardiff, do I understand correctly he was discharged for drunkenness or for burning the fruit? Or is there any difference? A. I would say they are one and the same thing. Of course I have no doubt that his habit entered into it some. Personally, I didn't discharge him, you understand. I have had the superintendent discharge men before for drinking on duty, men whom I regretted to have discharged. In fact, he discharged a nephew of mine one time for that, a fellow whom I thought a great deal of, and I refused to reinstate him, and couldn't reinstate him under the conditions. If I did, then I would have to discharge the superintendent.

"Q. Is there any difference between burned and smoked fruit? A. Oh, very much, yes.

"Q. Then, I understand that the reason for your discharging him because of drunkenness or burned fruit being—or the two being one and the same thing? A. I think that is correct, yes.

"Q. Now, it was not for union activity? A. Not at all."

At another place Mr. Cardiff, the manager of the plant, pointed out why it was hazardous to its business and impractical for the respondent to keep Conner in its employ and the serious consequences that might ensue if it did. He said:

"In the case of Mr. Conner, it is absolutely impossible to reinstate him on account of the fact that he is given to the use, the excessive use of liquor and uses it while on duty. If we should reinstate Mr. Conner, we would in all probability have our insurance canceled, or if we didn't have our insurance canceled, if we had a fire we would never be able to adjust our claim. If it became known that we had a man who was addicted to the use of liquor in that firing room that would be the end of it. And if we got our insurance canceled, why our jittery banker would call our loans, and we would be out of business in a short time.

"It is just out of the question to have a man in that firing room who is not responsible at all times every minute."

We now point out how this unfair conduct of the trial examiner is reflected in the findings and opinion of the Board. Relying solely on this "Chair Examination," the Board also eliminated everything relating to Conner's drinking habits and its effect upon his work or its connection with his discharge, because it is asserted that during this "Chair Examination" Dasdice "finally agreed that 'the damage rather than the drinking' was responsible for Conner's discharge, and that 'drinking had nothing to do with it.' " In this summary way all consideration of this accumulation of evidence in regard to Mr. Conner's unfortunate failing for drink and its bearing on this case is swept away upon the mere assertion that through this "Chair Examination" of Dasdice it is determined that respondent has abandoned its defense in that regard, and no attention whatever is accorded to the objections to this ruling of the Trial Examiner made by counsel for respondent at the hearing or to the uncontradicted testimony of Cardiff, the president of respondent and the manager of the plant.

Too much time has already been devoted to the methods used by the Trial Examiner, and we will refer to but one other instance of his conduct, which has to do with his notable effort to discredit the evidence of the several witnesses whose testimony proved that Howfield, the swamper, had spoiled the shook, as charged by respondent. Here the Trial Examiner extended the technique of his "Chair Examinations" to include at the same time compulsory answers based on unfounded, hypothetical questions combined with evidence furnished by himself, which, it is asserted, render the positive evidence against Howfield unbelievable. The Trial Examiner caused a drawing of a portion of the plant premises to be prepared under his questioning and direction, and similarly, he had one damaged piece of shook marked. The details of this procedure are too lengthy to reproduce here, but find illustration in the excerpt from the record which marks their culmination:

"Trial Examiner Wood: May I see the shook board, counsel? Please mark it, Mr. Kane, Board's exhibit 10.

"(Thereupon the board referred to was marked Board's Exhibit 10 for identification.)

"Q. (By Trial Examiner Wood) Have you a pencil? A. Yes.

"Q. Would you mind taking the board and marking with a long line and an arrow the direction of the ceiling, in reference to how the board, that shook, is placed? A. This is the ceiling right over here.

"Trial Examiner Wood: The witness places a transverse line.

"The Witness: This is the ceiling. This here is the floor, 8 feet. The shook is placed right over in here, underneath the ceiling.

"Q. (By Trial Examiner Wood) Now, taking this shook board, it is standing up like that. A. Yes, sir.

"Q. So, if we put a long line, a vertical line here and an arrow, we indicate— A. (Interrupting) The way the shook was laid.

"Q. The way the shook was laid? A. Yes.

"Q. Straight up? A. Yes, sir.

"Q. And the arrow points towards the ceiling? A. Yes, sir.

"Q. And the water drips down on the side of the shook board, this side being approximately one-quarter of an inch thick? A. Yes, sir.

"Q. Explain, please, how the water dripping down from above with the shook board standing up as you have told us, could leave a stain like that on the surface? A. This here, evidently, was on the bottom, right to the bottom of the pile.

"Q. The bottom of the pile? A. Yes, sir.

"Q. One side on the floor? A. Here, evidently—

"Q. Just a minute. One side on the floor? A. No, this side on the floor.

"Q. How? A. This side on the floor. And the dripping gets between—we have 25 of this type of shook bundled together.

"Q. Twenty-five bundled together? A. Yes, sir. The water will seep between the shook and stick there. Naturally, they are kind of tied together and it will leave a stain.

"Q. How do you explain then that there is no—that the stains on this board indicate that the water came at an acute angle, striking the board's flat surface and not the side of the board? A. I can't explain that.

"Trial Examiner Wood: That is all."

The Trial Examiner assumed that the water which caused the stain could not have come from the direction in which the witnesses said they had seen it dripping from the kilns above, and when the superintendent could not explain the stain on the wood, based on the Trial Examiner's erroneous speculative theory, all the evidence of the witnesses as to the facts were disregarded because out of harmony with the capricious supposition of the Trial Examiner. And in total disregard of his conduct the Board approved his attitude.

If the record on this phase of the case be relieved of the vagaries originating in the bias of the Trial Examiner, the common-sense observation of the superintendent that—"The water will seep between the shook and stick there. Naturally, they are kind of tied together and it will leave a stain.", would require no explanation of other fine-spun theories.

The assurance with which the Trial Examiner insists that he can look at a piece of stained shook and, without knowing whether its place in the bundle was on the top or the bottom or in between, can calculate with unerring accuracy the exact angle whence came the drop of water that caused the damage, is amazing. The fact that the findings and order of the Board in this and other important particulars rest in such performances of the Trial Examiner is convincing proof that his conduct deprived respondent of a fair hearing.

In concluding comment on the remarkable methods in which this trial examiner conducted this hearing it might be pertinent to point out that in the opening of the case for the Board, and to the time it closed its case in chief, its witnesses were given less than two record pages of this "Chair Examination." Conner and Howfield, the principal witnesses for the Board, were given none at all. On the other hand, "Chair Examinations" of the respondent's witnesses take up no less than *seventy-four* pages of the record.

Throughout his personally conducted inquisition may plainly be seen a determination of the Trial Examiner to compel the witness to give the answer desired by him. The Trial Examiner was guilty of threatening, badgering, and arguing with witnesses, making statements during the hearing contradictory of the true facts, cutting short cross-examination, and acting more in the role of a prosecutor than impartial examiner. There were many of these instances, only some of which are outlined above. The attitude of the Trial Examiner was unjustified and his conduct reprehensible. The entire record has been read and re-read. The Circuit Court of Appeals for the Eighth Circuit well said, in Montgomery Ward & Co. v. National Labor Relations Board, 103 F.2d 147, 156:

"Obvious bias of examiner. Naturally, it requires reading of this entire evidence to get the full perception of the clearly biased attitude of the examiner. Instead of maintaining the impartial position of one who is to determine—in a preliminary stage—the ultimate facts and action thereon, he assuming the place of attorney supporting the complaint.

"We do not mean that an examiner is not free to, and should, interrogate witnesses when necessary to elicit or clarify testimony. What we do mean is that, when he does interrogate, he should do so as an impartial participant and not as an advocate endeavoring to establish one side or the other of the controversy before him.

"This record is full of instances of hostile and searching examination of witnesses who might be expected to be favorable to the company or the intervener while similar action does not appear as to witnesses favorable to the complainant."

It may truly be said that respondent made no strenuous objection to such conduct of the Trial Examiner during the course of the hearing, but such objection may not always be necessary—especially where it would be of no avail. Furthermore, "failure of counsel * * * to object may well have been due to their feeling that that course might antagonize the Examiner to the detriment of their clients."

Cupples Co. Mfrs. v. National Labor Relations Board, 8 Cir., 106 F.2d 100, 113.

With respect to the conduct of the Trial Examiner during the course of the hearing, the case of Inland Steel Co. v. National Labor Relations Board, 7 Cir., 109 F.2d 9, 14, 17, 20, 21, appears to be exactly in point. There the Circuit Court of Appeals for the Seventh Circuit set aside an order of the National Labor Relations Board because, among other reasons, the Company was not awarded a fair hearing. The partial attitude, the type and method of questioning, and the tactics of the trial examiner, which the court found hostile and partisan in that case correspond with his attitude in this case; indeed, it was the *identical* Trial Examiner who conducted both hearings. What the court there said aptly applies here:

"Another attack made upon the Examiner arises from his alleged hostile and coercive examination of witnesses. * * * Many pages of petitioner's brief are directed at this criticism, where we are cited to numerous pages of the voluminous record in support thereof. After reading and studying the instances specifically called to our attention, as well as other portions of the record, we are forced to the conclusion that the conduct of the Examiner in this respect plainly discloses he laid aside all semblance of serving in a judicial capacity. * * * To obtain the complete picture requires a reading of the record.

"During the hearing, the practice followed consisted of a direct examination by the party who introduced the witness, a cross-examination by the opposite party, followed by an examination by the Examiner. We think it can be stated as a general proposition (there may be exceptions) that the Examiner devoted very little time to the examination of important witnesses favorable to the Board, while on the other hand, his examination of important witnesses for Inland was of great length, indulged in apparently for the purpose of impairing the credit or weight to be attached to their testimony.
* * *

"It is argued by petitioner that the nature of the cross-examination and the characterization of witnesses by the Trial Examiner was such as to intimidate them and to adduce improper evidence useful to the purpose of the Board. We think it was calculated to have such effect.
* * *

"The Act authorizes the Board to enter an order upon a complaint alleging unfair labor practices, only after a 'hearing.' This must mean a trial by a tribunal free from bias and prejudice and imbued with the desire to accord to the parties equal consideration. * * *

"That a trial by a biased judge is not in conformity with due process is sustained by the authorities. * * *

"The court, in Jordan v. Massachusetts, 225 U.S. 167, 176, 32 S.Ct. 651, 652, 56 L. Ed. 1038 said: 'Due process implies a tribunal both impartial and mentally competent to afford a hearing. * * *'

"The principle is aptly stated in People v. Naimark, 154 App.Div. 760, 139 N.Y.S. 418, 420, where it is said: '* * * The first idea in the administration of justice * * * is that a judge must necessarily be free from all bias and partiality. He cannot be both judge and party, arbiter and advocate in the same cause. Mankind are so agreed in this principle that any departure from it shocks their common sense and sentiment of justice.'
* * *

"The recognition of the principle is as essential in proceedings before administrative agencies as it is before courts. [Cases cited and quoted.] * * *

"The rule is again clearly stated in Morgan v. United States, 304 U.S. 1, 14, 58 S.Ct. 773, 999, 82 L.Ed. 1129."

See also National Labor Relations Board v. Ford Motor Co., 6 Cir., 114 F.2d 905, 909, and Ford Motor Co. v. National Labor Relations Board, 305 U.S. 364, 59 S.Ct. 301, 83 L.Ed. 221.

The injustice done by this kind of hearing can be remedied only by setting aside the order of the Board and remanding the case to it for a new hearing before a different examiner and for a determination by the Board upon the record to be made upon such new hearing. Such order will be entered herein.